**In re Gene M. BARRETT, Debtor.**

**CLARENDON NATIONAL INSURANCE COMPANY, Plaintiff,**

v.

**Gene M. BARRETT, Defendant.**

**Bankruptcy No. 392–31619 SAF–7. Adv. No. 392–3316 RCM.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

June 21, 1993.

$921,689.94, is non-dischargeable under § 523(a)(4) of the Bankruptcy Code. Clarendon National Insurance Company ("Plaintiff" or "Clarendon") seeks to bar relitigation of the factual determinations made in the State Court action, and requests a determination that the judgment debt is non-dischargeable. The dispute centers on the status and nature of the legal relationships that Defendant and his wholly-owned subsidiaries established with Plaintiff.

Under 28 U.S.C. §§ 1334 and 157(a), and the Standing Order of Reference, this Court has jurisdiction over Barrett's bankruptcy case. This matter is a core proceeding requiring the determination of dischargeability.

### Factual Background

Defendant engaged in the insurance business in Florida through three tiers of corporations. Defendant was the sole shareholder, director, and president of Barrett and Associates, Inc. ("B & A"), a Texas corporation. In turn, B & A owned all of the outstanding stock in American Mobile Home Insurance, Inc. ("American"), a Florida corporation, and Excel Financial Services, Inc. ("EFSI"), a Texas corporation. American owned all the stock of Florida General Agency, Inc. ("Florida General"), a Florida corporation. Defendant was president of all three subsidiaries.

Florida General was licensed as a managing general insurance agent in Florida. On or about May 1986, Clarendon appointed Florida General its managing agent in the State of Florida, pursuant to a general agency agreement with American Excel Corporation ("Excel"). The agreement authorized Florida General to appoint insurance agents, accept insurance applications, collect premiums, bind coverage of insurance policies, and issue insurance policies on behalf of Clarendon. EFSI, an affiliate of Florida General, was licensed as an insurance premium finance company in Florida.

During June 1987, Clarendon notified Excel and Florida General that it was termi-

Alan Leibel, Boswell & Kober, Douglas C. Kearney, Kearney & Associates, Dallas, TX, for plaintiff.

Michael R. Cooper, Dooley & Rucker, P.C., Dallas, TX, for defendant.

### MEMORANDUM OPINION

ROBERT C. McGUIRE, Chief Judge.

Pursuant to Bankruptcy Rule 7052, the following are the Court's Findings of Fact and Conclusions of Law in connection with the trial held in the above-referenced adversary proceeding on February 26, 1993. This case addresses whether a state court judgment against debtor Gene M. Barrett ("Defendant" or "Barrett"), for conversion of collected insurance premiums totalling

nating Excel's authority to act on behalf of Clarendon effective August 31, 1987.

Sometime in July 1987, Barrett, President and CEO for Florida General, requested that Clarendon authorize Florida General to continue writing Clarendon insurance policies in Florida for sixty additional days. Clarendon declined to grant that request, explaining that AMA of Florida, Inc. ("AMA") had an exclusive contract, and that if AMA would authorize Florida General to write Clarendon policies through AMA, Clarendon would permit that arrangement.

On August 17, 1987, AMA and Barrett reached an oral agreement concerning Barrett's request that Florida General be permitted to continue writing Clarendon insurance policies. The terms of that agreement were that, for sixty days beginning September 1, 1987, Florida General would write Clarendon insurance policies in Florida as a general agent of Clarendon through AMA. Premiums collected by Florida General were required to be paid to AMA at its Boca Raton, Florida office.

Florida General wrote Clarendon insurance policies during its sixty-day contract with AMA, which resulted, or should have resulted, in $1,050,000 in premiums, none of which reached AMA or Clarendon. Instead, those monies were used to cover the operating expenses of Florida General and B & A. Of the premiums generated (less commissions), $649,000 was due and owing to AMA and Clarendon. During the time the AMA/Florida General Agreement was in effect, EFSI financed approximately fifty percent of all the policies through premium finance agreements with insureds who agreed to make certain payments of principal, interest, and/or fees in consideration of a promise by EFSI to advance the insurance premiums to Clarendon on behalf of the insureds. EFSI breached those contracts by failing to advance to Clarendon any premiums financed pursuant to those contracts.

On or about August 15, 1989, AMA assigned to Clarendon all of its rights against Florida General.

Prior to the commencement of Barrett's bankruptcy proceeding, Clarendon instituted a lawsuit against Florida General, B & A, EFSI, Jose DePoo [1], and Barrett, based on the conversion of Clarendon's insurance premiums. Specifically, Clarendon alleged premiums collected by Florida General were trust funds received in a fiduciary capacity pursuant to § 626.561 Fla.Stat. (1987). Clarendon asserted Barrett's involvement as a corporate officer in Florida General rendered Barrett personally liable for Florida General's misconduct.

At the end of the trial, the jury returned a verdict, which, among other things, found that Barrett committed an act of conversion while acting in his capacity as a corporate officer. The court rendered a final judgment on July 23, 1991 against Barrett and others in the amount of $921,689.94. The judgment is final and non-appealable.

On May 14, 1992, Clarendon filed its action objecting to Barrett's discharge under §§ 523(a)(4) and 727(a)(2) of the Code.[2] In its non-dischargeability action, Plaintiff asserts that the Florida statutes impose significant duties on managing general insurance agents, regarding the handling of insurance premiums, thereby creating an express or technical trust, enforceable under § 523(a)(4) of the Code. In the alternative, Plaintiff contends Florida law, at all relevant times, has characterized conversion of insurance premiums as larceny, and by so doing, has provided an independent basis under § 523(a)(4) on which to deny discharge of the judgment debt.

In response, Defendant disputes that the Florida statutes in question create the type of trust arrangement contemplated by § 523(a)(4), in that the statutes do not require the agent to segregate funds in a separate bank account, and to periodically account for premium collections. Though

---

**1.** Jose DePoo was Vice President of American and Florida General at all relevant times.

**2.** Clarendon's § 727(a)(2) claim was based on the conversion of non-exempt to exempt assets, after Clarendon had begun collection activities to satisfy its judgment. A discussion of Clarendon's claim under § 727(a)(2) follows *infra* at pp. 536–537.

the statutes contain language that the premiums are to be "held in trust", Defendant asserts that language is not determinative of the existence of a fiduciary relationship. Defendant also questions whether the scope of fiduciary duty, owed by Florida General to AMA, if any, can be imputed to Barrett, individually, as a shareholder and director of Florida General, for purposes of § 523(a)(4).

Alternatively, Defendant asserts it is not appropriate to declare a debt non-dischargeable on the basis of "technical" statutory larceny, as described in § 626.-561(3) Fla.Stat. (1987).[3]

The Court is satisfied that Florida insurance statutes establish an express trust relating to the handling of insurance premiums, and that Defendant breached his duties as a fiduciary in diverting insurance premiums for his own use. Based on those findings, the Court concludes that the State Court judgment in the amount of $921,-689.94 is non-dischargeable, pursuant to § 523(a)(4) of the Bankruptcy Code.

This Court finds no basis for denying Barrett a discharge under § 727(a)(2) of the Bankruptcy Code, and denies this portion of the relief sought by Clarendon.

### Discussion

It has consistently been held that the scope of the concept "fiduciary", for purposes of a § 523(a)(4) exception to discharge, is a question of federal law. *Mat-ter of Angelle*, 610 F.2d 1335 (5th Cir.1980); *In re Guy*, 101 B.R. 961 (Bkrtcy.N.D.Ind. 1988). However, state law determines whether a trust relationship exists. *In re Guy, supra* at 983. A bankruptcy analysis under § 523(a)(4) involves a two-step process—state law is consulted to determine whether the requisite trust exists; however, the fiduciary nature of the relationship ultimately remains a federal question. *Id.*

A fiduciary relationship may exist where a state statute has defined the particular relationship as fiduciary. *In re Whitlock*, 449 F.Supp. 1383 (W.D.Mo.1978). The state statute creating the fiduciary relationship, however, must impose a trust on the funds prior to the act creating the debt, and spell out fiduciary duties. *In re Johnson*, 691 F.2d 249 (6th Cir.1982).

The Fifth Circuit, in *In re Nicholas*, 956 F.2d 110 (5th Cir.1992), surveyed decisions evaluating dischargeability claims construed under analogous trust statutes of various states, and divided those statutes into three groups. The Court's conclusions relating to trust statutes involving construction funds apply equally well to statutes involving the collection of insurance premiums:

> [C]ourts hold that states which only impose criminal or other penalties for failure of a contractor to make a certain disposition of construction funds do not create fiduciary capacity for dischargeability purposes. These courts reason that any trust relationship that is created

**3.** The Court agrees with the Barrett that Clarendon has failed to state a claim for larceny or embezzlement as a basis for excepting the State Court judgment from discharge. For purposes of § 523(a)(4), this Court is not bound by the definition of the Florida statute § 626.561(3) Fla.Stat. (1987), but is entitled to construe the term "larceny", as that term is interpreted under federal common law. *In re Langworthy*, 121 B.R. 903 (Bkrtcy.M.D.Fla.1990). *In re Katzen*, 47 B.R. 738 (Bkrtcy.D.Mass.1985); *Matter of Storms*, 28 B.R. 761 (Bkrtcy.E.D.N.C.1983). To declare a debt non-dischargeable on the basis of such a "technical" statutory larceny would be to allow states to interfere with a debtor's fresh start in ways not contemplated within the provisions of the Bankruptcy Code. *Matter of Storms, supra* at 765.

Applying common law, the definition of larceny must be a "felonious taking of another's personal property with intent to convert it or deprive the owner of same." *Langworthy, supra* at 907–908. Plaintiff's larceny claim is totally without merit—Barrett, acting as Clarendon's agent, lawfully came into possession of the insurance premiums. Similarly, this Court agrees that Plaintiff has failed to meet its burden of proof on the embezzlement exception to discharge. Specifically, Plaintiff has failed to establish Defendant's intent to defraud at the time Barrett and the corporate defendants in the State Court action misappropriated the insurance premiums. One factor negates any evidence of an intention to defraud—Defendant's use of the monies to benefit his affiliated corporations to enable them to pay their debts in connection with the insurance business. *In re Littleton*, 942 F.2d 551 (9th Cir.1991); *In re Bryant*, 147 B.R. 507 (Bkrtcy.W.D.Mo.1992); *Matter of Storms, supra.*

by such statutes does not arise prior to and independently of the wrong.

At the other end of the spectrum, courts hold that states which expressly designate the funds received by the contractor as trust funds and which explicitly impose specific and detailed duties on the contractor regarding the funds create a fiduciary relationship for dischargeability purposes....

Between the two ends of the spectrum are cases, such as this one, dealing with statutes which refer to the funds as trust funds but which do not specifically impose specific and detailed duties upon the contractor with respect to those funds.

*In re Nicholas, supra* at 112, citing *In re Baird,* 114 B.R. 198, 202–203 (9th Cir.BAP 1990). (Citations omitted).

■ The Florida statute concerning insurance premiums falls within the latter category described by *Nicholas.*[4] Section 626.561 does not expressly oblige the holder of the insurance premiums to maintain the separate identity of any trust *res,* nor does it require the segregation of funds or periodic accounting by the insurance agent to the insurer. However, it does expressly prohibit the diversion or use of trust funds for any purpose other than to pay the "insurer, insured, or other person entitled thereto." § 626.561(1) and (3). That statutory prohibition against all intentional diversions of trust funds triggers the same fiduciary responsibilities recognized under § 523(a)(4) of the Bankruptcy Code. *In re Johnson, supra; Matter of Nicholas, supra; Boyle v. Abilene Lumber, Inc.,* 819 F.2d 583 (5th Cir.1987); *In re Baird,* 114 B.R. 198 (9th Cir.BAP 1990).

In fact, Bankruptcy Courts, interpreting the Florida insurance premiums statute, § 626.561(1), have recognized that it statutorily creates a fiduciary relationship between an insurance agent and the insurer, for purposes of § 523(a)(4) of the Bankruptcy Code. *Matter of Good,* 33 B.R. 163 (Bkrtcy.M.D.Fla.1983); *In re Feldman,* 85 B.R. 163 (Bkrtcy.S.D.Fla.1988). *See also, Matter of Whitlock,* 449 F.Supp. 1383 (W.D.Miss.1978).[5]

---

**4.** Section 626.561, Fla.Stat. (1987), entitled *Reporting and accounting for funds,* provides as follows:

(1) All premiums, return premiums, or other funds belonging to insurers or others received by an agent, solicitor, or adjuster in transactions under his license shall be trust funds so received by the licensee in a fiduciary capacity; and the licensee in the applicable regular course of business shall account for and pay the same to the insurer, insured, or other person entitled thereto.

(2) The licensee shall keep and make available to the department books, accounts, and records as will enable the department to determine whether such licensee is complying with the provisions of this code. Every licensee shall preserve such books, accounts, and records pertaining to a premium payment for at least 3 years after the making of such payment; provided, however, the preservation of records by computer or photographic reproductions or records in photographic form shall constitute compliance with this requirement. The 3-year requirement shall not apply to insurance binders when no policy is ultimately issued and no premium is collected.

(3) Any agent, solicitor, or adjuster who, not being lawfully entitled thereto, diverts or appropriates such funds or any portion thereof to his own use shall upon conviction be guilty of larceny by embezzlement and shall be punished as provided by law.

**5.** As part of the charge to the jury in the State Court action, the jury was given an instruction patterned on § 626.561 Fla.Stat. (1987):

Conversion and breach of fiduciary duty. The essential elements [sic] of conversion is an unauthorized action which deprives another of his property.

Now, there is a section of the Florida statute which provides as follows—and this pertains to fiduciary duty: All premiums belonging to insurers or others received by an agent in transactions under his license are trust funds received by the agent in a fiduciary capacity, and the licensed agent shall account for and pay the premiums to the insurer, the insured or other person entitled thereto in the regular course of business.

One is said to act in a fiduciary capacity when the business he transacts or the money which he handles is not his own or for his own benefit but for the benefit of another person as to whom he stands in a relation implying and necessitating great confidence and trust on the one part, and a high degree of good faith on the other part.

(Trial Transcript, May 10, 1991, p. 23, lines 1–22 (Plaintiff's Exhibit ("PX") 4)).

For the trial court to have found against Barrett (and the affiliated corporate defendants), the Florida Court had to have found an express trust existed pursuant to § 626.561 Fla.Stat. (1987). (*See,* the instructions (PX 4), the verdict (PX 5), the judgment (PX 6)), and Trial Tran-

■ Though fiduciary duties may have been statutorily imposed on Florida General, acting as a managing general insurance agent, Defendant insists he is not personally liable for any corporate misconduct. Defendant asserts no fiduciary relationship existed between Defendant individually, and Plaintiff, as required by § 523(a)(4). Defendant emphasizes that the debt underlying the judgment represents a corporate debt owed by Florida General, for which he cannot be held individually liable. (In this connection, generally see *In re Bennett*, 989 F.2d 779 (5th Cir.1993)). Additionally, Barrett insists the Florida Insurance Code's provisions regarding personal liability only affect licensed insurance agents.[6] It is necessary to consult Florida law on this point.

Two provisions of the Florida Insurance Code create personal liability for officers/shareholders of managing general insurance agents:

626.795. Corporations, liability of agent

Any life insurance agent who is an officer, director, stockholder, or employee of an incorporated life insurance agency shall remain personally and fully liable and accountable for any wrongful acts, misconduct, or violations of any provisions of this code committed by such licensee or by any person under his direct supervision and control while acting on behalf of the corporation.

Fla.Stat. (1984).

626.734. Corporations, liability of agent

Any general lines insurance agent who is an officer, director, stockholder, or employee of an incorporated general lines insurance agency shall remain personally and fully liable and accountable for any wrongful acts, misconduct, or violations of any provisions of this code committed by such licensee or by any person under his direct supervision and control while acting on behalf of the corporation.[7]

Fla.Stat. (1987).

Barrett's insistence that §§ 626.795 and 626.734 impact only shareholders and officers who hold insurance licenses is misplaced. Florida case law suggests that the technical control maintained by shareholders, due to their substantial ownership interests in insurance agencies, and their active role in the day-to-day management of the agencies, as corporate officers and directors, render them individually liable for torts committed on behalf of the corporation. Florida courts have consistently held that the Insurance Code's statutory requirements for liability of an individual are that he personally, or through actions of those under his control, have wrongfully failed to remit premiums. In *Hartnett, Inc. v. Dept. of Ins. of the State of Florida*, 432 So.2d 155 (Fla.D.C.A., 3d Dist. 1983), the court imposed personal liability upon certain general lines insurance agents for diversion of premiums, based solely on their status as officers and shareholders of the general lines agency. Specifically, one of the officers, the treasurer of the insurance agency, was authorized to sign, and did sign, checks on behalf of the general lines agency. Based on that record, the court found that the treasurer/director, either personally or through actions of those under his direct supervision or control,

---

script, May 7, 1991, the Barrett admissions utilized as part of Barrett's cross examination on February 26, 1993).

**6.** The undisputed facts established that the debtor, Barrett, was not a licensed insurance agent in the State of Florida at the time of the transactions, and had not been one for approximately ten years. However, Florida General, at all relevant times, possessed the permit required by the Florida Insurance Code's licensure statute to engage in the insurance business in Florida. §§ 626.121(2) (1987) and 626.091(1) (1987). The Florida Insurance Code's use of the terms "permit" and "license" interchangeably suggest no distinction exists between the terms. Bar-

rett's attempt to limit application of the Florida Insurance Code to "licensed" agents is improper. Managing general insurance agents, such as Florida General, and their officers and shareholders are directly subject to §§ 626.734 and 626.795.

**7.** Section 626.727, which defines the scope of Chapter 626 of the Florida Insurance Code, states that the provisions covered by that chapter apply to (1) general lines agents, as defined in § 626.041; (2) solicitors, as defined in § 626.071; and (3) service representatives, as defined in § 626.081, or supervising or *managing general agents,* as defined in § 626.091.

wrongfully failed to remit premiums due the insurer, in violation of § 626.561, Fla. Stat. (1981). Likewise, in the *Matter of Good, supra,* personal liability was imposed on the president and fifty-one percent shareholder of a general insurance agency, for misappropriation of insurance premiums based on the officer's technical control over the corporation.

Because both Barrett and his affiliated companies EFSI, B & A and Florida General, failed to properly account for the insurance premiums owed AMA and Clarendon, Barrett has committed an act of defalcation under § 523(a)(4). To establish a defalcation, Clarendon is not required to prove that the fiduciary, Barrett, derived a personal benefit from the diversion of insurance premiums, or that there was any criminal intent. Barrett's argument that there was no finding in the State Court action of (i) fraud, embezzlement, or larceny; or (ii) use of the funds for personal benefit of the debtor, is unpersuasive. Clarendon need only prove that the diversion of insurance premiums was unauthorized. It is not necessary for Clarendon to prove an intentional wrong by Barrett, once a technical or express trust is established. *In re Gagliano,* 44 B.R. 259 (Bkrtcy.N.D.Ill.1984); *In re Guy, supra; In re Hirsch,* 101 B.R. 364 (Bkrtcy.S.D.Fla. 1989); *Carey Lumber Co. v. Bell,* 615 F.2d 370 (5th Cir.1980) ("misappropriation does not have to constitute intentional wrongdoing."); *In re Interstate Agency, Inc.,* 760 F.2d 121 (6th Cir.1985); *Matter of Moreno,* 892 F.2d 417, 421 (5th Cir.1990).

The requirements for establishing "defalcation" do not differ under either the Bankruptcy Code or § 626.561(1) Fla.Stat. (1987). Florida courts have held that liability under Florida Insurance Statute 626.561(1) arises irrespective of intent:

> ... We do not agree that an intent to misappropriate is a necessary element to prove a violation of section 626.561(1). Liability arises upon a showing that a person has direct supervision and control over an agency, but not accounted for or turned over [collected insurance premiums] to the insurance company for whom

> the agency is acting. *This is analogous to a trustee's liability to a beneficiary for lost trust funds.*

*Copeland Insurance Agency, Inc. v. Home Insurance Co.,* 502 So.2d 93, 94 (Fla. 5th D.C.A.1987). (Emphasis supplied).

In the case at bar, there is no doubt that Defendant diverted funds belonging to AMA and Clarendon to his own use, and the use of his affiliated companies. The misappropriation or defalcation of funds is undisputed. In light of the foregoing, the Court is of the opinion that, pursuant to Florida law, Defendant not only stood in a fiduciary relationship with AMA and Clarendon, but also incurred personal liability for the misappropriated funds, as a result of his position as an officer and shareholder in B & A and Florida General. Accordingly, the debt owed to Clarendon under the State Court judgment, in the amount of $921,689.94, must be declared non-dischargeable.

Finally, the Court addresses Plaintiff's objection to Defendant's discharge pursuant to § 727(a)(2) of the Code. Plaintiff contends Defendant's conversion of non-exempt property into exempt property (*i.e.,* his use of $30,000 cash to pay down the mortgage debt on his home) subsequent to the entry of the judgment against him individually, bars his discharge under § 727(a)(2). Specifically, Plaintiff asserts that Defendant furnished false financial statements to Plaintiff, deliberately undervaluing his assets in an attempt to conceal the non-exempt property from execution. Plaintiff argues that the non-disclosure of the $30,000 represents a fraud of the type described in *In re Reed,* 700 F.2d 986 (5th Cir.1983). Alternatively, even if this Court finds that Barrett's actions do not rise to the level of fraud, Clarendon contends that Barrett's actions demonstrate an intent to "hinder or delay" creditors. *In re Smiley,* 864 F.2d 562 (7th Cir.1989). This Court disagrees, and denies the relief sought by Plaintiff under § 727(a)(2).

The record before the Court is devoid of evidence establishing a pattern of sharp dealing of the type described in *Smiley* or *Reed;* nor is there any evidence of fraud.

Defendant's accountant credibly testified at the trial that the inclusion of the $30,000 cash settlement received by Barrett Computer Services, Inc., a corporation wholly-owned by Barrett would, in no way, have affected the manner in which Barrett's financial statements were compiled. The $30,000 recovered was an asset of Barrett Computer Services, Inc., an insolvent corporation. Even taking the $30,000 into account, the corporation had a negative net income, and no equity. The financial statement accurately reflected that company's state of affairs.

There is no evidence in the record which suggests that Barrett's pre-bankruptcy planning was abusive or fraudulent as to his creditors, and, therefore, Clarendon's objection under § 727(a)(2) is denied.