**In re M.M. WINKLER AND ASSOCIATES, Bill Morgan, and Okee McDonald.**

**Bruno DEODATI, Plaintiff,**

v.

**M.M. WINKLER AND ASSOCIATES, Bill Morgan, and Okee McDonald, Defendants.**

Bankruptcy Nos. 94–20383, 94–10382, and 94–10381.
Adversary No. 94–2093.

United States Bankruptcy Court, N.D. Mississippi.

Oct. 6, 1996.

Stephen Corban, Mitchell, Voge, Beasley and Corban, Tupelo, MS, for Bruno Deodati.

Dana E. Kelly, Phelps Dunbar, Jackson, MS, for M.M. Winkler and Associates, Bill Morgan, and Okee McDonald.

## OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration before the court is a complaint to determine the dischargeability of a debt filed by the plaintiff, Bruno Deodati, against the debtors, M.M. Winkler and Associates, Bill Morgan, and Okee McDonald; the parties having agreed that the court may enter a judgment based on an agreed stipulation of facts; and the court having reviewed same, as well as, the memoranda of authorities submitted by the parties in conjunction with their cross-motions for summary judgment, hereby finds as follows, to-wit:

### I.

The court has jurisdiction of the subject matter of and the parties to this adversary proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (I), and (O).

### II.

M.M. Winkler and Associates was a Mississippi general partnership composed of partners Bill Morgan, Okee McDonald, and Patsy McCreight. All of the partners were certified public accountants who provided accounting and tax services to the general public. Bruno Deodati was a client of Winkler's who utilized exclusively the services of McCreight. During the course of the professional relationship, McCreight misappropriated a substantial amount of money from Deodati's account.

On February 7, 1994, Deodati recovered a judgment in the Circuit Court of Lee County, Mississippi, jointly and severally, against Winkler, Morgan, and McDonald, in the amount of $292,068.33, plus costs and interest. The judgment was not appealed by the defendants and is now final under the Mississippi Rules of Civil Procedure. On February 22, 1994, Morgan and McDonald filed voluntary petitions for relief pursuant to Chapter 7 of the Bankruptcy Code. Winkler sought separate relief pursuant to Chapter 11. Deodati filed this adversary proceeding against all three debtors seeking a determination that the aforesaid judgment is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2), (4), and (6). Both Deodati and the defendants filed motions for summary judgment. The court found that genuine issues of material fact remained in dispute and initially denied the motions. Thereafter, the parties agreed to present a stipulation of facts with a certification that there would be no other factual issues in dispute. The parties also agreed that the court could consider the matter without the necessity of a hearing.

### III.

The following facts have been stipulated by the parties:

1. At all times relevant hereto, M.M. Winkler & Associates ("Winkler") was a Mississippi general partnership composed of three partners, Bill Morgan, Okee McDonald and Patsy McCreight. Each of the individual partners owned a 33⅓% interest in the partnership.

2. Prior to 1985, Bruno Deodati ("Deodati") became a client of Winkler. Patsy McCreight ("McCreight") was the contact partner for Deodati and undertook sole responsibility for Deodati's accounting needs. Neither Bill Morgan ("Morgan") or Okee Mc-

Donald ("McDonald") worked on the Deodati file.

3. During calendar year 1985, Deodati executed an "authorization" dated June 18, 1985, authorizing Winkler to "purchase and redeem certificates of deposit in" Deodati's name.

4. At no time prior to 1992 did Morgan or McDonald have any knowledge of the execution of the authorization. However, after 1990 but prior to 1992, Morgan and McDonald did learn that McCreight was handling Deodati's certificates of deposit.

5. During July, 1987, McCreight, acting pursuant to the authorization, withdrew One Hundred Thousand and No/100 Dollars ($100,000.00) from the account of Deodati at Peoples Bank. McCreight, contrary to the terms of the authorization, endorsed said check and deposited the same into her personal bank account at First National Bank of Pontotoc.

6. During February, 1990, McCreight, acting pursuant to the authorization, received a check at maturity of a Deodati certificate of deposit in the sum of Forty–Two Thousand Six and 88/100 Dollars ($42,006.88). McCreight, contrary to the terms of the authorization, endorsed said check and deposited the same into her personal bank account at First National Bank of Pontotoc.

7. No funds from the two certificates of deposit taken by McCreight were ever deposited into the partnership's account. Neither Morgan nor McDonald ever received any of said funds.

8. From 1985 through 1991, Winkler billed Deodati for "accounting services rendered," including the preparation of Deodati's income tax returns for the period of 1986 through 1990, and the services associated with the purchasing and redeeming certificates of deposit pursuant to the June 18, 1985 authorization, and the accountings prepared to reflect said transactions. Said statements were as follows:

| Date of Statement | Amount of Statement |
| --- | --- |
| July 17, 1986 | $315.00 |
| March 30, 1987 | $360.00 |
| June 22, 1988 | $520.00 |
| June 23, 1989 | $417.28 |
| June 21, 1990 | $985.00 |
| June 30, 1991 | $965.00 |

Deodati paid Winkler on each of said statements. To the best of Morgan's and McDonald's knowledge, Deodati was not billed separately by McCreight for her services, and the statements from Winkler were the only bills received by Deodati for the services performed by McCreight.

9. Payments on the statements referenced in the preceding paragraph were deposited into the partnership bank account of Winkler. From said partnership bank account, Winkler paid all ordinary and customary expenses of operating the business. The three partners took monthly draws against projected earnings for the partnership and received periodically in equal shares the undistributed income of the partnership, including any net income realized from the billings to Deodati.

10. To conceal her embezzlement of Deodati's funds, McCreight prepared false accountings to Deodati concerning his investments and earnings thereon and included the false information in preparation of Deodati's income tax returns. As part of the concealment, McCreight reported a fictitious Farmer's and Merchant's Bank certificate of deposit in the amount of $100,000.00 in her accountings to Deodati, and further reported in the accountings and tax returns for the years 1987–90 non-existent income from the fictitious certificate of deposit, resulting in an overstatement of income and an overpayment of taxes by Deodati in the applicable years as to this certificate of deposit.

## IV.

Before examining the dischargeability of the debt owed by Morgan and McDonald, the court will first examine the relevance of a § 523(a) cause of action in the Winkler Chapter 11 case.

■ In drafting the Bankruptcy Code, Congress provided for a discharge that is exceedingly broad for non-individual Chapter 11 debtors. Section 523(a) applies only to cases involving individuals. It does not limit the discharge available to corporate or partnership debtors. The confirmation of a Chapter 11 plan of reorganization discharges

all pre-petition debts of non-individual Chapter 11 debtors unless the plan provides for the liquidation of all or substantially all of the property of the estate, and unless the debtor will not engage in business after confirmation of the plan. 11 U.S.C. § 1141(d)(3). Confirmation, of course, is the key to the debtor's discharge. In order to gain confirmation, the debtor must meet all of the tests set forth in 11 U.S.C. § 1129, one of which is the requirement that the Chapter 11 plan must be filed in "good faith."

Accordingly, those allegations of the complaint which seek a determination of the dischargeability of the Winkler judgment debt will be dismissed, but without prejudice.

## V.

The core issue before the court is whether, for dischargeability purposes, fraudulent actions of a partner may be imputed to the remaining members of the partnership even though they did not participate in or otherwise have knowledge of or ratify the actions of the rogue partner. Clearly, under Mississippi law, a partnership, as well as, the individual partners are liable for the misapplication of a client's funds. The state court judgment against each of the debtors was the product of the following statutes:

§ 79–12–27. **Partnership Bound by Partner's Breach of Trust**

The partnership is bound to make good the loss:

(a) where one partner acting within the scope of his apparent authority receives money or property of a third person and misapplies it; and

(b) where the partnership in the course of its business receives money or property of a third person and the money or property so received is misapplied by any partner while it is in the custody of the partnership.

§ 79–12–29. **Nature of Partner's Liability**[1]

All parties are liable jointly and severally for all debts and obligations of the partner-

ship including those under section[s] ... 79–12–27.

Miss.Code Ann. §§ 79–12–27, 79–12–29 (1972).

■ The policy considerations underpinning the Mississippi statutes are clear. Providing for joint and several liability allows an aggrieved party access to "deep pockets," or at least "multiple pockets." As an additional benefit, visiting the sins of one upon the many heightens the diligence of each partner and promotes sound professional business practices within the State of Mississippi. Nevertheless, once an individual partner seeks bankruptcy protection, the focus must necessarily shift away from the state's interest in providing solvent defendants and regulating business practices to a determination of whether the facts supporting the judgment award warrant excepting the debt from the discharge provisions provided by the Bankruptcy Code. Although a joint and several judgment was imposed in state court against the debtors herein, this court is required to conduct a separate examination of the facts to determine the question of dischargeability under federal law. *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); *In re Shuler*, 722 F.2d 1253 (5th Cir.1984); *In re Dunn*, 95 B.R. 414 (Bankr. N.D.Miss.1988). "The validity of a creditor's claim is determined by rules of state law. [citation omitted] Since 1970, however, the issue of nondischargeability has been a matter of federal law governed by the terms of the Bankruptcy Code." *Grogan v. Garner*, 498 U.S. 279, 284–85, 111 S.Ct. 654, 657–58, 112 L.Ed.2d 755, 763 (1991).

## VI.

Section 523(a)(2)(A) excepts from discharge "any debt ... for money, property, services, or extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud, other than a statement respecting the debtors or an insider's financial condition." In the present action, the plaintiff does not allege that either Morgan or Mc-

---

**1.** This statute was amended, effective from and after July 1, 1995, in order to define the liability of partners in a limited liability partnership. The

statute as set forth hereinabove is the version which was in effect at all times relevant to this proceeding.

Donald committed any overt actions resulting in the debt which is the focus of this complaint. Rather, the plaintiff argues that as partners of McCreight, the false pretenses, false representations and actual fraud of McCreight may be imputed to Morgan and McDonald for dischargeability purposes.

■■■ As a general rule, § 523(a)(2)(A) contemplates frauds involving "moral turpitude or intentional wrong: fraud implied in law which may exist without imputation of bad faith or immorality, is insufficient." *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir.1992). (Citing *3 Collier on Bankruptcy* ¶ 523.08[4] (15th ed.)). Nevertheless, "[a] debtor who has made no false representation may ... be bound by the fraud of an agent acting within the scope of the debtor's authority." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284 (5th Cir.1995) (Citing *3 Collier on Bankruptcy* ¶ 523.08[4] (15th ed.)). Within the Fifth Circuit, the test for determining when a debtor "may" be bound by the fraud of a partner has been set forth in the case of *Luce v. First Equipment Leasing Corp. (In re Luce)*, 960 F.2d 1277 (5th Cir.1992).

In *Luce*, a husband and wife were partners in several partnerships which were engaged in the business of leasing computer systems. The Luces financed their operations through loans obtained from various finance companies. After the Luces sought bankruptcy relief, the finance companies filed timely complaints seeking to have their respective debts excepted from discharge based on allegations of fraud and misrepresentation. The bankruptcy court and the district court ruled in favor of the finance companies as to both partners. On appeal to the Fifth Circuit, Mrs. Luce argued that the debts should be dischargeable in her case because she had no knowledge of her husband's fraudulent representations, and that his knowledge and actions should not be imputed to her as an "innocent" partner. In addition, Mrs. Luce argued that the creditors had failed to show that she had benefitted from her husband's fraudulent representations.

In responding to Mrs. Luce's allegation that knowledge by the "innocent" partner of the fraud perpetrated by the "guilty" partner is a prerequisite for imputing fraud, the Fifth Circuit began by reviewing a Supreme Court case which is more than a century old:

> [A] partner's fraud [can] be imputed to a debtor to make a debt nondischargeable under § 17(a)(2) of the Bankruptcy Act, [the predecessor statute to 11 U.S.C. § 523(a)(2) ]. This is true not only where the debtor did not consent to h[er] partner's fraudulent acts, but where [s]he had no knowledge or reason to have knowledge of these acts.

*In re Luce*, 960 F.2d at 1282 (citing *Federal Dep. Ins. Corp. v. Calhoun (In re Calhoun)*, 131 B.R. 757, 760–61 (Bankr.D.D.C.1991) (Discussing *Strang v. Bradner*, 114 U.S. 555, 560–62, 5 S.Ct. 1038, 1041, 29 L.Ed. 248 (1885))).

The court observed that other courts have held that fraud can be imputed to an innocent partner for purposes of 11 U.S.C. § 523(a)(2)(A) regardless of that partner's lack of knowledge. *In re Luce*, 960 F.2d at 1282 (citing *BancBoston Mortgage Corp. v. Ledford (In re Ledford)*, 127 B.R. 175, 184 (M.D.Tenn.1991); *Terminal Builder Mart v. Warren (In re Warren)*, 7 B.R. 571, 573 (Bankr.N.D.Ala.1980); *Love v. Smith (In re Smith)*, 98 B.R. 423, 426 (Bankr.C.D.Ill. 1989); *Fluehr v. Paolino (In re Paolino)*, 75 B.R. 641, 649 (Bankr.E.D.Pa.1987); *Citizens State Bank v. Walker (In re Walker)*, 53 B.R. 174, 179 (Bankr.W.D.Mo.1985)). Finally, the Fifth Circuit noted that a few "sharply criticized" decisions have refused to impute fraud or misrepresentations without proof that the principal knew or should have known of the agent's conduct. Clearly, the great weight of authority dictates a finding by this court that the knowledge, or lack thereof, on the part of Morgan and McDonald, regarding the fraud and/or misrepresentations of McCreight, is irrelevant to the issue of whether McCreight's misconduct may be imputed to Morgan and McDonald for dischargeability purposes.

■■■ In responding to Mrs. Luce's allegations that her debts to the finance companies should be dischargeable because the evidence did not prove that she had actually obtained

any money, property, or services by fraud, the Fifth Circuit stated as follows:

> The test under § 523(a)(2)(A) . . . is not whether the debtor actually procured the money, property, services, or credit for him or herself. (Citation omitted) Rather, the Code dictates that a particular debt is nondischargeable "[i]f the debtor benefits in some way" from the money, property, services, or credit obtained through deception. (Citation omitted)

*In re Luce, Id.* at 1283. Despite Mrs. Luce's assertions that she did not directly benefit from the fraud perpetrated on the creditors by her husband/partner, the court found evidence that Mrs. Luce did benefit when funds fraudulently obtained by the partnership were deposited in Mr. and Mrs. Luce's joint bank account. Money in the joint account was then used to acquire real estate, stock, and oil and gas investments, held jointly, as well as, to pay business and personal expenses of the Luce's. Although fraud may be imputed to an innocent partner regardless of knowledge, within the Fifth Circuit, a finding of nondischargeability will follow only if the innocent partner benefitted "in some way" from the money, property, services, or credit fraudulently obtained by the offending partner.

■ In the matter before the court, the parties stipulated that the funds misappropriated from Deodati's account by McCreight were deposited into her personal bank account. The parties also stipulated that no portion of the misappropriated funds were ever deposited into the partnership's account, and that neither Morgan nor McDonald received any portion of these funds.

Despite the plaintiffs assertions to the contrary, this court concludes that the decision in *Luce* requires a finding that the innocent partners must have shared in some manner in the benefits of the fraud perpetrated by the offending partner before that fraud may be imputed to them for bankruptcy non-dischargeability purposes.

This court's interpretation of *Luce* is supported by a similar interpretation rendered by the Sixth Circuit Court of Appeals. In *BancBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556 (6th Cir.1992)

*cert. denied,* 507 U.S. 916, 113 S.Ct. 1272, 122 L.Ed.2d 667 (1993), the court was called upon to determine, for purposes of determining dischargeability under 11 U.S.C. § 523(a)(2)(A), whether the fraud of one general partner should be imputed to a second general partner who had no actual knowledge of the fraudulent acts. The debtors in the case, Thomas Ledford and J. Gregg Sikes, M.D., were general partners in a venture established to construct condominiums. The partnership's business was managed by Ledford. Dr. Sikes was not involved in the day-to-day operations. Ledford, without the knowledge of Dr. Sikes, submitted false purchase contracts to obtain financing. Following the partnership's bankruptcy filing, the lender instituted a non-dischargeability cause of action based on fraud. The bankruptcy court concluded that Ledford was not entitled to a discharge, but held that the debt was dischargeable as to Dr. Sikes because he had no knowledge of his partner's fraud. The district court reversed, finding that the knowledge of Ledford's fraud could be imputed to Dr. Sikes as a matter of law. Dr. Sikes appealed. In addressing the issue of whether the fraud of one partner can be imputed to another partner, who had no actual knowledge, the court cited *Luce* and labeled the analysis therein as "persuasive." The Sixth Circuit noted that the Fifth Circuit had based its conclusion that fraud should be imputed to Mrs. Luce on the following facts: "(1) Mrs. Luce was a partner, (2) Mr. Luce made the misrepresentations while acting on behalf of the partnerships in the ordinary course of business, and (3) as a partner, Mrs. Luce shared in the monetary benefits of the fraud." *In re Ledford,* 970 F.2d at 1561. In analogizing the *Luce* decision to the facts before it, the Sixth Circuit observed the following:

> Like Mr. Luce, Mr. Ledford perpetrated his fraud while acting on behalf of the partnership in the ordinary course of the partnership's business. Like Mrs. Luce, Dr. Sikes shared in the monetary benefits of the fraud. *Mr. Ledford did not divert the proceeds of the construction loan to his personal use.* The funds were used for partnership purposes: they financed a con-

dominium project from which Dr. Sikes stood to profit.

*In re Ledford, Id.* (emphasis added). Based on the three-part test established in *Luce,* the Sixth Circuit imputed the fraud of Ledford to Dr. Sikes. The ruling was based, in part, on a finding that Dr. Sikes benefitted from the fraud of his partner when the fraudulently obtained loan proceeds were used for ordinary partnership business purposes. The court specifically noted that Ledford had not diverted the loan proceeds to his *personal* use. An inference can logically be drawn, that had the fraudulently obtained funds been deposited by Ledford into his personal account, that the court would likely have concluded that the fraud should not be imputed to Dr. Sikes because he would not have benefitted from his partner's fraudulent activities.

Based on these two Circuit decisions, this court finds that by placing the funds embezzled from Deodati into her personal account, rather than the partnership account, McCreight prevented Morgan and McDonald from unwittingly benefitting from her misconduct. Additionally, the embezzled funds were never used for the ordinary business purposes of the Winkler partnership, and neither the embezzlement nor its concealment occurred while McCreight was acting on behalf of the partnership in the ordinary course of its business. As such, two prongs of the three part *Luce* test are noticeably absent in this proceeding.

## VII.

As an alternative theory that Morgan and McDonald benefitted from the misconduct of McCreight, Deodati argues that his payment of annual billing statements received from Winkler for general accounting services, during the time when McCreight was either embezzling the subject funds or concealing her misconduct, constituted a benefit to Morgan and McDonald since the fees were deposited into the partnership general account.

The parties stipulated that from 1985 through 1991, the Winkler partnership billed Deodati for "accounting services rendered," which included the preparation of Deodati's income tax returns, and for the services associated with purchasing and redeeming Deodati's certificates of deposit. The parties stipulated that Deodati paid the annual accounting bills promptly, and that the payments received were deposited into the partnership's general operating account from which all ordinary expenses were paid, and from which the individual partners received periodic distributions.

The parties further stipulated that in an attempt to conceal her embezzlement, McCreight prepared and submitted false accountings to Deodati and included the false financial information on Deodati's income tax returns. This caused Deodati's annual income to be inflated, and, resulted in an overpayment of his personal income taxes for these years.

Deodati argues that his payment of the annual statements during and after McCreight had embezzled funds from his account is evidence that the partnership, and the individual partners, benefitted from McCreight's fraudulent activities. Deodati also contends that one cannot separate McCreight's original conversion of his funds from her attempts to conceal her wrongful acts. The court has found little guidance to assist in deciding the difficult question of whether Winkler's receipt of fees from Deodati, during the time when McCreight was continuing to conceal her embezzlement, constitutes a benefit to Morgan and McDonald.

In *Federal Deposit Insurance Corp. v. Mmahat,* 907 F.2d 546 (5th Cir.1990), John Mmahat, a partner in the Mmahat & Duffy law firm, was general legal counsel for a federally-chartered savings and loan association (hereinafter "S & L"). In his capacity as general counsel, Mmahat instructed the board of directors of the S & L to ignore federal law which restricted the amount of money which could be loaned to any one borrower. Due to a high number of loan defaults, the S & L was eventually taken over by the Federal Deposit Insurance Corporation (F.D.I.C.), which sued Mmahat, individually, and Mmahat & Duffy for malpractice. At trial, the evidence showed that Mmahat had encouraged the loans so that his law firm could generate more fees from the loan closings. As a result, the jury found

Mmahat, individually, and Mmahat & Duffy liable for the defaulted loans. The jury, through special interrogatories, also found that the law firm had committed malpractice despite no evidence that anyone at the firm, other than Mmahat, had committed any culpable acts. Mmahat filed for bankruptcy after the F.D.I.C. law suit was filed, but before the trial had begun. The bankruptcy court lifted the automatic stay, and a nondischargeability complaint filed by F.D.I.C. was consolidated with the malpractice cause of action. Since the jury found that Mmahat had breached a fiduciary duty, the district court found that the judgement was nondischargeable pursuant to 11 U.S.C. § 523(a)(4). On appeal, the nondischargeability decision was affirmed.

Although cited by the plaintiff, this case has almost no precedential significance. Since Mmahat's partners had not filed bankruptcy, the opinion leaves unanswered the critical question of whether Mmahat's misconduct could be imputed to the "innocent" partners who had committed no culpable acts, even though they had possibly shared in the fees generated by Mmahat once they were deposited into the law firm's account.

In the matter presently before the court, unitemized annual billing statements, totalling $3,562.28, were submitted by the Winkler partnership to Deodati over a period of six years. These fees are practically insignificant when compared to the magnitude of McCreight's misappropriations. The benefit to Morgan and McDonald could only be described, at best, as nominal. To say that this slight benefit should render the entire judgment debt non-dischargeable would inflict an incredibly inequitable result. Regardless, this is a troubling question for the court, which cannot ignore the likelihood that a portion of these fees compensated the partnership for work performed by McCreight in preparing the fraudulent, inflated income tax returns for Deodati.

Under the existing circumstances, however, particularly the continued absence of two elements of the three part *Luce* test, this court concludes that the fraud and/or misrepresentations of McCreight cannot be imputed to the defendants. Accordingly, the § 523(a)(2)(A) allegations contained in Deodati's nondischargeability complaint are not well taken.

## VIII.

Section 523(a)(4) provides that an individual debtor will not be discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." It is uncontested in this matter that neither Morgan nor McDonald engaged in any acts of fraud, embezzlement, or larceny. The plaintiff again seeks to impute the misconduct of McCreight to her partners. The court found no authorities specifically addressing the issue of the imputation of misconduct to partners in a § 523(a)(4) context. This court will, therefore, apply the § 523(a)(2)(A) analysis set forth above to the § 523(a)(4) cause of action. Accordingly, because neither Morgan nor McDonald benefitted to any measurable extent from the culpable acts of McCreight, the fraud, embezzlement and/or larceny of McCreight cannot be imputed for a determination of nondischargeability under § 523(a)(4).

The issue of "defalcation" while acting in a "fiduciary capacity," however, requires closer examination by the court. Defalcation is defined as the "failure to meet an obligation" and the "failure to properly account for ... funds." Black's Law Dictionary, 375 (5th ed.1979). The term "fiduciary capacity" is defined as follows:

One is said to act in a "fiduciary capacity" or to receive money or contract a debt in a "fiduciary capacity," when the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part. The term is not restricted to technical or express trusts, but includes also such offices or relations as those of an attorney at law, a guardian, executor, or broker, a director of a corporation, and a public officer.

Black's Law Dictionary, 564 (5th ed.1979).

Deodati asserts that the Winkler partnership and its three individual partners owed a

general fiduciary duty to him as a client who conducted business with the partnership. Deodati asserts that the fiduciary relationship is further underscored by his delivering to McCreight the document entitled "Authorization," which he executed on June 18, 1985, and which states as follows:

I hereby authorize M.M. Winkler and Associates, Certified Public Accountants, to purchase and redeem certificates of deposit in my name and any bank or savings and loan association which is insured by FDIC or FSLIC, respectively. I hereby also authorize the firm to make withdrawals from my savings account for this purpose.

◼ The parties stipulated that at no time prior to 1992 did Morgan or McDonald have any knowledge of the execution of the authorization[2]. However, the parties further stipulated that after 1990, but prior to 1992, Morgan and McDonald did learn that McCreight was handling Deodati's certificates of deposit. The term "fiduciary capacity" is not defined in the Bankruptcy Code. However, the scope of the term "fiduciary" is a matter of federal law. *Matter of Angelle,* 610 F.2d 1335 (5th Cir.1980); *see also, Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153–54, 79 L.Ed. 393 (1934). State law determines whether a trust obligation or relationship exists. *Angelle,* 610 F.2d at 1339. An analysis of dischargeability under § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity involves a two step process:

(1) State law must be consulted to determine whether a trust relationship exists;
(2) The fiduciary nature of the relationship, however, remains a federal question.

*Clarendon National Insurance Co. v. Barrett (In re Barrett),* 156 B.R. 529 (Bankr. N.D.Tex.1993).

◼ In regard to relationships of partners to one another, the Mississippi Code expressly provides that the partners are accountable to each other as fiduciaries concerning partnership assets and property. § 79–12–41,

Miss.Code Ann. (1972). No such express fiduciary language appears in the section of the Miss.Code dealing with the relationships of partners to persons dealing with the partnership. Nevertheless, § 79–12–27 of the Miss.Code provides that the partnership is liable when one partner receives money or property of a third person and misapplies it. This statute certainly infers a generic fiduciary duty by the partnership in regard to funds entrusted to it. Within the Fifth Circuit, the application of § 523(a)(4) is not limited to fiduciary relationships arising just from technical or express trusts. Also included are "relationships in which trust-type obligations are imposed pursuant to statute or common law." *Matter of Bennett,* 989 F.2d 779 (5th Cir.1993)[3]. Since within the Fifth Circuit the "technical" or "express" trust requirement is satisfied by a "trust-type obligation," imposed pursuant to statute, it is not necessary for this court to decide the issue of whether the authorization signed by Deodati and delivered to McCreight constitutes an express trust. A "trust-type obligation" to Deodati existed insofar as the Winkler partnership was concerned.

◼ Although it was not stipulated as fact, Deodati does not dispute that the embezzlement by McCreight was actually discovered by Morgan. Sometime in early 1992, Deodati contacted Morgan after failing to reach McCreight directly. He made inquiry regarding certain documentation that was missing from his annual accounting. During the course of attempting to locate the missing documentation, Morgan noticed a discrepancy and began an investigation. It was this investigation by Morgan which led to the discovery of the embezzlement by McCreight. Morgan immediately provided a full report to Deodati concerning the matter.

Clearly, McCreight was guilty of fraud and defalcation while acting in a fiduciary capacity. However, her wrongful acts must be imputable to Morgan and McDonald before a judgment of non-dischargeability can be ren-

---

**2.** The specific acts of embezzlement by McCreight took place in July 1987 and February 1990.

**3.** *But cf., In re Romero,* 535 F.2d 618 (10th Cir.1976). Within the Tenth Circuit, 11 U.S.C. § 523(a)(4) applies only to a fiduciary relationship arising from a technical or express trust, not from a trust implied by law.

dered against them. Once again, this court must rely on its analysis recited above regarding the imputation of fraud in the § 523(a)(2)(A) context. As such, this court likewise concludes that the plaintiff's § 523(a)(4) cause of action for fraud or defalcation while acting in a fiduciary capacity against Morgan and McDonald is not well taken.

At the most, Morgan and McDonald were negligent in not more closely monitoring the activities of their co-partner prior to 1992. However, negligent supervision without any active participation in the fraudulent transaction is not sufficient to create a fiduciary relationship for the purposes of nondischargeability under § 523(a)(4). *In re Grabau*, 151 B.R. 227 (N.D.Cal.1993).

### IX.

Section 523(a)(6) excepts from discharge any debt arising from the "willful and malicious injury by the debtor to another entity or the property of another entity." 11 U.S.C. § 523(a)(6). Within the Fifth Circuit the term "willful" has been defined as a wrongful act intentionally done while "malicious" has been defined as meaning without just cause or excuse. *Chrysler Credit Corp. v. Perry Chrysler Plymouth*, 783 F.2d 480, 486 (5th Cir.1986); *Seven Elves, Inc. v. Eskenazi*, 704 F.2d 241 (5th Cir.1983); *see also, Berry v. McLemore (In re McLemore)*, 94 B.R. 903 (Bankr.N.D.Miss.1988). The "willful and malicious injury" exception to discharge set forth in 11 U.S.C. § 523(a)(6) includes a willful and malicious conversion. 3 *Collier on Bankruptcy* ¶ 523.16[3] (15th ed.) (citing 124 Cong. Rec. H11,095–6 (d. ed. Sept.28, 1978); S17,412–13 (d. ed. Oct.6, 1978)). The plaintiff once again argues that the willful and malicious conduct exhibited by McCreight should be imputed to her partners. Without doubt, the actions of McCreight in converting funds entrusted to her by the plaintiff constitutes a willful and malicious injury under § 523(a)(6). However, the court finds that such conduct cannot be imputed to either Morgan or McDonald.

Unlike the other causes of action, authority exists to support a finding that willful and malicious conduct of a partner may not be imputed for purposes of a § 523(a)(6) dischargeability determination absent a showing that the otherwise innocent partners benefitted from the culpable acts. In the Ninth Circuit Court of Appeals opinion, *In re Cecchini*, 780 F.2d 1440 (9th Cir.1986), a plaintiff hotel owner sought a determination that a judgment debt of two partners was nondischargeable under § 523(a)(6) as a willful and malicious conversion. Impulsora Del Territorio Sur, the plaintiff in the adversary proceeding, had entered into an agreement with C.V.R. Investments, a partnership consisting of William Van der Meer and the defendants, Robustelli and Cecchini. Pursuant to the agreement, C.V.R. was to solicit American tourists to travel to Mexico and stay at the plaintiff's hotel. The plaintiff agreed to reimburse C.V.R. for its expenses in hiring an agent to perform the promotional activities. The agent, once hired by C.V.R., received checks from the tourists for prepayment and would forward the checks directly to the plaintiff. C.V.R. advanced its own funds to pay the agent and periodically billed the plaintiff for these funds. Subsequently, Cecchini and Robustelli, acting on a belief that the plaintiff was neglecting to reimburse them for sums advanced to the agent, directed the agent to deliver prepayment checks directly to C.V.R. rather than to the plaintiff. When the plaintiff discovered that it was not receiving the prepayment monies, it brought a state court action to recover the funds and damages. Cecchini and Robustelli entered into a stipulated judgment in favor of the plaintiff. When Cecchini and Robustelli later filed individual bankruptcy petitions, the plaintiff filed its § 523(a)(6) adversary proceedings. The bankruptcy court held that the debtors' liability to the plaintiff was dischargeable, and the decision was affirmed by the bankruptcy appellate panel.

Both the bankruptcy court and the bankruptcy appellate panel had interpreted § 523(a)(6) as requiring a finding of an "intentional injury" by the debtors in order to support a finding of nondischargeability under § 523(a)(6). After examining authorities from other circuits, including *Matter of Quezada*, 718 F.2d 121 (5th Cir.1983) and *Seven Elves, Inc. v. Eskenazi*, 704 F.2d 241 (5th

Cir.1983), the Ninth Circuit held that an act may be "willful and malicious" for purposes of § 523(a)(6) even absent proof of a specific intent to injure. Accordingly, the Ninth Circuit reversed the bankruptcy appellate panel. After articulating the correct legal standard to be employed, the court re-examined the issue of the dischargeability of Cecchini's and Robustelli's debt. It is this examination which is important to the matter before this court.

The Ninth Circuit first noted that from the record before it there was "... ample evidence from which to determine the involvement of both Cecchini and Robustelli." *Id.* at 1443. Cecchini instructed a C.V.R. employee to obtain the prepayment checks from its agent rather than allowing the agent to deliver those checks to the plaintiff as previously agreed. The prepayment checks were endorsed and deposited into the partnership account. As to Robustelli, the court found as follows: "Robustelli, at a minimum, *participated in the benefits of the conversion,* as evidenced by his entering into the stipulated judgment in favor of plaintiff. Therefore, applying basic partnership law, Cecchini's knowledge and intent are imputed to Robustelli." *Id.* page 1444 (emphasis added).

The imputation and the ultimate determination of nondischargeablity as to Robustelli were made only after a finding that the converted funds were placed in the partnership account and that Robustelli participated in the benefits of the conversion. This court, in its analysis of the § 523(a)(2)(A) cause of action, previously made a finding that neither Morgan nor McDonald benefitted to any measurable extent from the culpable acts of McCreight. The legal reasoning in the *Cecchini* opinion concerning imputation of culpable conduct to a partner is compatible with the Fifth Circuit *Luce* opinion and the Sixth Circuit *Ledford* opinion, cited hereinabove. All three opinions have as a common thread that the court should find that the "innocent" partner benefited from the culpable acts of the offending partner before imputing the culpable conduct. Accordingly, based on *Cecchini,* this court finds that the willful and malicious conduct of McCreight may not be imputed to Morgan and McDonald for purposes of a § 523(a)(6) determination of nondischargeability.

The only culpable conduct possibly attributable to Morgan and McDonald is their *alleged* failure to properly monitor the actions with McCreight. Deodati argues that if a review procedure had been in place, McCreight would have been discouraged from committing the acts of embezzlement, or, at least, the second act of embezzlement would have been forestalled when the first act was discovered. Without reviewing the extent of a partner's duty, as to third persons, to monitor a fellow partner's activities, this court finds that the plaintiffs allegations are not well founded in a § 523(a)(6) context. At the worst, McDonald and Morgan committed a negligent act in their failure to monitor McCreight. However, the "willful and malicious" standard set forth in § 523(a)(6) does not include acts of reckless disregard or even gross negligence. *See, e.g., In re Compos,* 768 F.2d 1155, 1158 (10th Cir.1985); *In re Scarlata,* 127 B.R. 1004, 1013 (N.D.Ill.1991).

## X.

Although not addressed by the parties in their respective briefs, the complaint filed herein contains an allegation of nondischargeability under § 523(a)(2)(B), which provides that an individual debtor will not be discharged from a debt obtained by the use of a statement in writing which is materially false, respecting the debtor's or an insider's financial condition on which the creditor relied and which was published by the debtor with the intent to deceive. This Code section is generally applied in situations where a debtor induces a creditor to loan money or extend credit based on the submission of a false financial statement. When the complaint was originally drafted, the plaintiff apparently theorized that the "Authorization" that *he* executed, authorizing the Winkler partnership to purchase and redeem his certificates of deposit, constituted a "statement in writing" for purposes of § 523(a)(2)(B). Although there is an allegation that the authorization was drafted by McCreight, it is undisputed that the document was drafted at the request of Deodati and executed by him. The authorization is simply not a materially

false document respecting the financial condition of any of the three debtors herein.

### XI.

Based on the foregoing analysis, the court finds that the complaint as it relates to defendant Winkler should be dismissed, without prejudice, and that judgment should be entered in favor of defendants, Morgan and McDonald, on the remaining allegations of the complaint.